## UNITED STATES *v.* CHEROKEE NATION.
## EASTERN CHEROKEES *v.* CHEROKEE NATION AND UNITED STATES.
## CHEROKEE NATION *v.* UNITED STATES.

### APPEALS FROM THE COURT OF CLAIMS.

Nos. 346, 347, 348. Argued January 16, 17, 18, 1906.—Decided April 30, 1906.

Under sec. 68 of the Cherokee Act of July 1, 1902, 32 Stat. 726, as construed by the act of March 3, 1903, 32 Stat. 996, and the agreement of December 19, 1891, providing for the sale of the Cherokee outlet, the Court of Claims had jurisdiction of all claims of the Cherokee Indians against the United States, and the claims were to be reopened and reexamined *de novo*, and the court and the accountants were to go behind statutory and treaty bars and receipts in full, and were to consider any alleged and declared amount of money promised but withheld under any treaty or law.

The United States, as stated in the Slade & Bender account made under the agreement of December 19, 1891, and as found by the Court of Claims, ✲ is liable to the Cherokee Nation for $1,111,284.70, the amount paid for the removal of the Eastern Cherokee Indians to the Indian Territory, improperly charged to the treaty fund.

The question whether interest should be allowed on this fund having been submitted, under the Eleventh Article of the Cherokee Treaty of 1846, to the Senate of the United States, and that body having by resolution

found that interest should be allowed at five per cent from June 12, 1838, until paid, the amount of interest was one of the subjects of difference referred to the Court of Claims under the act of July 1, 1902, and that court had jurisdiction to allow interest, and correctly awarded it at the rate, and from the time specified, in the Senate resolution.

The term, Cherokee Tribe or any band thereof, as used in the act of July 1, 1902, means the Cherokee people as a people, and not the Cherokee Nation as a body politic, and the Court of Claims correctly decided that the amount awarded to the Cherokee Nation be paid to the Secretary of the Interior to be by him received and distributed to the persons entitled thereto, but such distribution should be made as to the Eastern Cherokees as individuals whether East or West of the Mississippi, parties to the treaties of 1835, 1836 and 1846, exclusive of the Old Settlers.

The Eastern and Emigrant Cherokees are not entitled to their demand of one-fourth of the entire sum awarded, but only to *per capita* payment with the Eastern Cherokees.

SECTION 68 of the act of Congress of July 1, 1902, entitled "An act to provide for the allotment of the lands of the Cherokee Nation, for the disposition of town sites therein, and for other purposes," 32 Stat. 716, 726, reads as follows:

"Jurisdiction is hereby conferred upon the Court of Claims to examine, consider, and adjudicate, with a right of appeal to the Supreme Court of the United States by any party in interest feeling aggrieved at the decision of the Court of Claims any claim which the Cherokee tribe, or any band thereof, arising under treaty stipulations, may have against the United States, upon which suit shall be instituted within two years after the approval of this act; and also to examine, consider, and adjudicate any claim which the United States may have against said tribe, or any band thereof. The institution, prosecution, or defense, as the case may be, on the part of the tribe or any band, of any such suit, shall be through attorneys employed and to be compensated in the manner prescribed in sections twenty-one hundred and three to twenty-one hundred and six, both inclusive, of the Revised Statutes of the United States, the tribe acting through its principal chief in the employment of such attorneys, and the band acting through a committee recognized by the Secretary of the Interior. The Court of Claims shall have full authority, by proper orders and

process, to make parties to any such suit all persons whose presence in the litigation it may deem necessary or proper to the final determination of the matter in controversy, and any such suit shall, on motion of either party, be advanced on the docket of either of said courts and be determined at the earliest practicable time."

February 20, 1903, the Cherokee Nation filed a petition in the Court of Claims asking judgment on an account rendered by Slade & Bender, pursuant to the treaty of March 3, 1893 (27 Stat. 640), with interest.

March 3, 1903, an act was approved entitled "An act making appropriations for the current and contingent expenses of the Indian Department and for fulfilling treaty stipulations with various Indian tribes for the fiscal year ending June thirtieth, nineteen hundred and four, and for other purposes," 32 Stat. 982, 996, containing the following provisions:

"Section sixty-eight of the act of Congress entitled 'An act to provide for the allotment of the lands of the Cherokee Nation, for the disposition of town sites therein, and for other purposes,' approved July first, nineteen hundred and two, shall be so construed as to give the Eastern Cherokees, so called, including those in the Cherokee Nation and those who remained east of the Mississippi river, acting together or as two bodies, as they may be advised, the status of a band or bands, as the case may be, for all the purposes of said section: *Provided,* That the prosecution of such suit on the part of the Eastern Cherokees shall be through attorneys employed by their proper authorities, their compensation for expenses and services rendered in relation to such claim to be fixed by the Court of Claims upon the termination of such suit; and said section shall be further so construed as to require that both the Cherokee Nation and said Eastern Cherokees, so called, shall be made parties to any suit which may be instituted against the United States under said section upon the claim mentioned in House of Representatives Executive Document numbered three hundred and nine of the second session of the

Fifty-seventh Congress; and if said claim shall be sustained in whole or in part the Court of Claims, subject to the right of appeal named in said section, shall be authorized to render a judgment in favor of the rightful claimant, and also to determine as between the different claimants, to whom the judgment so rendered equitably belongs, either wholly or in part, and shall be required to determine whether, for the purpose of participating in said claim, the Cherokee Indians who remained east of the Mississippi river constitute a part of the Cherokee Nation, or of the Eastern Cherokees, so called, as the case may be."

The claim mentioned in said H. R. Ex. Doc. No. 309, 57th Cong., 2d sess., is therein referred to as "the award rendered under the Cherokee agreement of December 19, 1891, ratified by act of Congress approved March 3, 1893."

March 14, 1903, a petition was filed on behalf of all the Eastern Cherokees, both west and east of the Mississippi river, alleging in substance that there was due to the Eastern Cherokees, upon the account of Slade & Bender, the sum of $1,111,284.70, with interest from June 12, 1838, as an award against the United States or, if the court should not hold said account as an award, the sum of $1,761,447.27, with interest at 5 per cent from the same date, together with interest on the income annually accruing, at the rate of five per cent per annum until paid, by virtue of the treaties of 1828 (7 Stat. 313), and the treaty of 1835-36, commonly known as the "treaty of New Echota." But at the trial of the case no contention was made for this larger amount.

March 20, 1903, a petition was filed on behalf of certain Eastern Cherokees, living east of the Mississippi, amended September 3, 1903, when petitioners took the title of the Eastern and Emigrant Cherokees, asserting their claim to a pro rata share of—

"That portion of the removal and subsistence fund improperly taken by the United States from the five million fund on account of removal of Eastern Cherokees, as found

by the expert accountants, Messrs. Slade & Bender, April 28, 1894, the said five million fund being an interest-bearing fund in the hands of the United States, as trustee, and representing the money paid by the Government to the Eastern Cherokees for the sale of their lands in North Carolina, Georgia, and Tennessee, or east of the Mississippi river, as set forth in article 1st of the treaty of New Echota, in north Georgia, on March 14, 1835, and articles 2 and 3 of the supplemental treaty, proclaimed May 23, 1836, this sum so misapplied amounting, in accordance with said accounting, to $1,111,284.70 with interest at 5 per cent per annum from the date of said wrongful taking, June 12, 1838, to date."

The three petitions were consolidated and heard as one case, and although in effect the proceedings were in equity, findings of fact and conclusions of law were filed.

Among the facts found were these:

## "XVIII.

"By section 14 of the act of Congress entitled 'An act making appropriations for the current and contingent expenses of the Indian Department, and for fulfilling treaty stipulations with various Indian tribes for the year ending June 30, 1889, and for other purposes,' approved March 2, 1889 (25 Stat. 1005), the President was authorized to appoint three commissioners to negotiate with the Indian tribes owning or claiming lands lying west of the ninety-sixth degree of longitude in the Indian Territory for the cession to the United States of all their title, claim, or interest of every kind or character in and to said lands, and he did appoint David H. Jerome, Alfred M. Wilson and Warren G. Sayre such commissioners.

"By virtue of the authority contained in an act of the Cherokee National Council, approved November 16, 1891, Elias C. Boudinot, Joseph A. Scales, Roach Young, William Triplett, Thomas Smith, Joseph Smallwood, and George Downing were duly appointed commissioners—

"'To meet and enter into negotiations with the above-named

commission, appointed by the President of the United States,
for the cession of the lands of the Cherokee Nation west of-the
96th degree of west longitude, and for the final adjustment
of all questions of interest between the United States and the
Cherokee Nation which are now unsettled.'

"By said act of Congress it was made the duty of said com-
missioners appointed by the President to report all agreements
resulting from such negotiations to the President, to be by
him reported to the Congress at its next session, and by the
act of the Cherokee council it was made the duty of the com-
missioners on the part of the Cherokee Nation to report all
their proceedings in full to the National Council for its ap-
proval and ratification. Ex. Doc. 56, 52d Cong., 1st sess., 17.

"At the outset of the negotiations between said commis-
sioners for the purchase and sale of said lands, which were
known as the 'Cherokee Outlet,' the commissioners on the
part of the Cherokee Nation renewed their claims and con-
tentions with respect to the balances alleged to be due to them
under various treaties, and particularly their contention that
the so-called treaty fund had been improperly charged with
the expense of the removal of the Eastern Cherokees to the
Indian Territory, and demanded as 'a condition precedent
to any agreement for the sale of the land' that some adjust-
ment of such contentions should be made.

"On the 19th of December, 1891, after prolonged negotia-
tions, the commissioners above named entered into articles
of agreement, by article I of which it was agreed that—

"The Cherokee Nation, by act duly passed, shall cede and
relinquish all its title, claim, and interest of every kind and
character in and to that part of the Indian Territory bounded
on the west by the one hundredth (100°) degree of west longi-
tude, on the north by the State of Kansas, on the east by the
ninety-sixth (96°) degree west longitude, and on the south
by the Creek Nation, the Territory of Oklahoma, and the
Cheyenne and Arapahoe Reservation created or defined by
Executive order, dated August 10, 1860, the tract of land

embraced within the above boundaries containing eight million one hundred and forty-four thousand six hundred and eighty-two and ninety-one one-hundredths (8,144,682.91) acres, more or less.'

"By article 2 that—

"For and in consideration of the above cession and relinquishment the United States agrees:'

"First. That it will remove from the limits of the Cherokee Nation as trespassers certain described persons.

"Second. That a certain article of the antecedent treaty of July, 1866, should be abrogated and held for naught. ·

"Third. That the judicial tribunals of the Cherokeee Nation should have exclusive jurisdiction in certain cases.

"Fourth. That—

"The United States shall, without delay, render to the Cherokee Nation, through any agent appointed by authority of the National Council, a complete account of moneys due the Cherokee Nation under any of the treaties ratified in the years, 1817, 1819, 1825, 1828, 1835–36, 1846, 1866, and 1868, and any laws passed by the Congress of the United States for the purpose of carrying said treaties, or any of them, into effect; and upon such accounting, should the Cherokee Nation, by its National Council conclude and determine that such accounting is incorrect or unjust, then the Cherokee Nation shall have the right, within twelve months, to enter suit against the United States in the Court of Claims, with the right of appeal to the Supreme Court of the United States by either party, for any alleged or declared amount of money promised but withheld by the United States from the Cherokee Nation, under any of said treaties or laws, which may be claimed to be omitted from, or improperly or unjustly or illegally adjusted in, said accounting; and the Congress of the United States shall, at its next session, after such case shall be finally decided and certified to Congress according to law, appropriate a sufficient sum of money to pay such judgment to the Cherokee Nation, should judgment be ren-

dered in her favor; or if it shall be found upon such accounting that any sum of money has been so withheld, the amount shall be duly appropriated by Congress, payable to the Cherokee Nation, upon the order of its National Council, such appropriation to be made by Congress, if then in session, and if not, then at the session immediately following such accounting.'

"Fifth. That certain citizens of the Cherokee Nation should have the right to select lands as homesteads under certain conditions; and

"Sixth. In addition to all of the foregoing enumerated considerations for the cession and relinquishment of title to the described lands, the United States shall pay to the Cherokee Nation, at such times and in such manner as the Cherokee National Council shall determine, the sum of $8,595,736.12 in excess of the sum of $728,389.46, the aggregate of amounts heretofore appropriated by Congress and charged against the lands of the Cherokees west of the Arkansas river.

"Said articles of agreement were accepted, ratified, and confirmed on the part of the Cherokee Nation by an act of the National Council approved January 4, 1892, and were also accepted, ratified, and confirmed on the part of the United States by act of Congress of March 3, 1893, 27 Stat. 640.

"Prior to the acceptance and ratification of said agreement on the part of the United States, as aforesaid, the commissioners on behalf of the United States, as required by the law under which they were appointed, had reported to the President the making of the articles of agreement aforesaid, and by way of explanation said:

"'As to the conditions of the agreement, besides the relinquishment of title upon the one part and the payment of a price in money on the other, it is necessary to state that the settlement of the matters contained in such conditions were made a condition precedent to any agreement for the sale of the land.

"'The accounting provided for in the fourth subdivision of article 2 of the agreement is inserted and agreed to, because

the Cherokees are compelled to accept the construction of the treaties made by the executive and administrative branches of the Government.

"'Whatever that construction is, the Indian must abide by. There is no appeal except to Congress. Without going specifically into details the Cherokees claim that upon a just accounting upon a proper construction of the treaties named, a large sum of money, principal and interest, will be found due them. They also desire to include lands as well as money, but they were induced to eliminate "lands" from the provision. With that eliminated the provision was agreed to, as set out. The Government has made the accounting, has kept the books, has construed the treaties. If that has been done properly, no harm can come from restating the account. If it has not been done properly, no possible reason can exist why the error should not be corrected.' Sen. Ex. Doc. 56, 52d Cong., 1st sess., pp. 11, 12.

"Gen. Thomas J. Morgan, Commissioner of Indian Affairs, in his report to the Secretary of the Interior on February 6, 1892, made the following explanation and comment on the fourth section of article 2, to wit:

"'The fourth section of article 2 provides for an accounting between the United States and the Cherokee Nation. The work necessary to render this account will be very heavy, and much time will be necessary to properly prepare the same. On this provision of the agreement the commissioners say:

"'The Government has made the accounting, has kept the books, has construed the treaties. If this has been done properly no harm can come from restating the account. If it has not been done properly no possible reason can exist why the error should not be. corrected. It creates no new obligations against the Government, but only provides for legal discharge of the old ones.'     ⸺.

"'This seems to me to be a reasonable view to take of this provision, and I do not see that any valid objection could be advanced against it.

"'In your reference of the matter to this office you said:

"'Particular attention is called to section 4 of article 2 of the agreement, with request for a full report as to what may be the state of the account between the United States and the Cherokees, if practicable, within a reasonable time; if not, your general conclusions.'

"'In reply to this indorsement I have the honor to say that if this section is construed to require the United States to state an account of moneys stipulated to be paid to the Cherokee Nation, under the treaties therein specified and under the various appropriation acts to carry the same into effect, this account could be prepared by this office within a reasonable time, say about two months. If, on the other hand, it be construed to require a detailed statement of all the moneys received and disbursements made by the United States of the Cherokee funds under said treaties and acts of Congress, which seems to me to be the intention of the parties negotiating the agreement, it would require the services of an expert accountant, with assistants, probably twelve months or more to review and copy the Cherokee accounts and records running back nearly a century. In order to prepare a statement of this kind it would require an appropriation by Congress of the sum of at least $5,000 to pay for the services of an expert accountant, and in the draft of a bill for the ratification of the agreement herewith inclosed, I have provided for the appropriation of that sum, or so much thereof as may be necessary for that purpose.' Senate Ex. Doc. No. 56, 52d Cong., 1st sess., p. 8.

"This report of the Commissioner was, on or about February 8, 1892, referred by the Secretary of the Interior to the Assistant Attorney-General for the Interior Department 'for his consideration and report upon the legality of the contract, the sufficiency of the proposed bill, and his views upon the questions of law relating to the subject,' and on or about February 25, 1892, said officer reported thereon, as appears

in said Senate Executive Document 56, Fifty-second Congress, first session, saying, among other things:

" 'The report and agreement were referred to the Commissioner of Indian Affairs, who, under date of February 6, 1892, reported favorably on the agreement, and transmitted with his report the draft of a bill to be submitted to Congress to ratify and carry out the provisions thereof. . . . The agreement contains two articles. The first relates to the cession and the second to the consideration therefor. . . .

" 'The considerations for said cession, as contained in article 2, are set forth under six subdivisions.' . . .

" 'The fourth and next provision of article 2 of the agreement requires the United States to render to the Cherokee Nation a complete accounting of all money agreed to be paid to the Indians or which they may be entitled to under any treaty or act of Congress since 1817. And if said accounting is satisfactory Congress shall make the necessary appropriation to pay the same. But if the accounting is not satisfactory, then the Cherokees to have the right to institute suit in the Court of Claims against the United States for the claimed amount, and Congress is to make the necessary appropriation to pay the judgment, if any, recovered.

" 'I see nothing in the stipulations herein to comment upon. It seems right and promotive of good feeling that there should be a full and final settlement of all claims and accounts of these Indians against the United States, and I think the terms of agreement are sufficiently clear to secure such accounting.

" 'The Commissioner of Indian Affairs asks for a special appropriation of $5,000 to enable him to make the accounting.'

"All of these reports were before the Congress when it accepted and ratified said articles of agreement by act of March 3, 1893, 27 Stat. 641, in the following language, to wit:

" 'Which said agreement is fully set forth in the message of the President of the United States, communicating the same to Congress, known as Executive Document No. 56 of the first session of the Fifty-second Congress, the lands referred

to being commonly known and called the "Cherokee Outlet;" and said agreement is hereby ratified by the Congress of the United States, subject, however, to the Constitution and laws of the United States and to acts of Congress that have been or may be passed regulating trade and intercourse with the Indians, and subject also to certain amendments thereto, as follows:  . . .  (Amendments not important here.)  . . .

" 'And the provisions of said agreement so amended shall be fully performed and carried out on the part of the United States; provided that the money hereby appropriated shall be immediately available, and the remaining sum of eight million three hundred thousand dollars, or so much thereof as is required to carry out the provisions of said agreement as amended and according to this act, to be payable in five equal instalments, commencing on the fourth day of March, eighteen hundred and ninety-five, and ending on the fourth day of March, eighteen hundred and ninety-nine, said deferred payments to bear interest at the rate of four per centum per annum, to be paid annually, and the amount required for the payment of interest as aforesaid is hereby appropriated; * * *

\* \* \* \* . \* \* \* \*

" 'The acceptance by the Cherokee Nation of Indians of any of the money appropriated as herein set forth shall be considered and taken and shall operate as a ratification by said Cherokee Nation of Indians of said agreement, as it is hereby proposed to be amended, and as a full and complete relinquishment and extinguishment of all their title, claim, and interest in and to said lands; * * *

\* \* \* \* \* \* \* \*

" 'And said lands, except the portion to be allotted as provided in said agreement, shall, upon the payment of the sum of two hundred and ninety-five thousand seven hundred and thirty-six dollars, herein appropriated, to be immediately paid, become, and be taken to be and treated as a part of the public domain.'

## "XIX.

"By said act of March 3, 1893, ratifying said agreement for the purchase of the 'Cherokee Outlet' the Congress also provided as follows:

"'The sum of five thousand dollars, or so much thereof as may be necessary, the same to be immediately available, is hereby appropriated, out of any moneys in the Treasury not otherwise appropriated, to enable the Commissioner of Indian Affairs, under the direction of the Secretary of the Interior, to employ such expert person or persons to properly render a complete account to the Cherokee Nation of moneys due said Nation, as required in the fourth subdivision of article 2 of said agreement.'

"Thereafter James A. Slade and Joseph T. Bender were employed as experts under the provisions of said section of said act, and they made and rendered an account pursuant to the provisions of paragraph 4 of article 2 of the articles of agreement of December 19, 1891, as ratified and affirmed by said act of March 3, 1893. Said account was by the Secretary of the Interior referred to the Commissioner of Indian Affairs for examination and report, and the same having been examined and approved by said Commissioner, was by the latter returned to the Secretary of the Interior, who transmitted the same to the Cherokee Nation by delivering a copy thereof to R. F. Wyley, its properly constituted agent for receiving the same, and said account so made, rendered, and transmitted was accepted by the Cherokee Nation by an act of its National Council approved December 1, 1894, and no suit was thereafter brought by the Cherokee Nation against the United States charging that said account was in anywise incorrect or unjust, but, on the contrary, the principal chief of the Cherokee Nation, as required by the act of its National Council above referred to, did notify the Secretary of the Interior of the acceptance of said Nation of said account as so stated by Messrs. Slade and Bender, and did request said Secretary of of the Interior to notify the Congress of the United States of

such acceptance, and on the 7th of January, 1895, the Secretary of the Interior reported the entire matter to the Congress in the following words:.

' "SIR: I have the honor to herewith transmit, in compliance with the provisions of the third subdivision of article 2 of the agreement made December 19, 1891, with the Cherokee Indians, ratified by the act of Congress approved March 3, 1893 (27 Stat. 643), a certified copy of ' a complete account of moneys due the Cherokee Nation under any of the treaties made in the years 1817, 1819, 1825, 1833, 1835–36; 1846, 1866, and 1868, and any laws passed by the Congress of the United States for the purpose of carrying said treaties, or any of them, into effect,' prepared in accordance with the provisions of the said act of March 3, 1893, together with a certified copy of an act of Cherokee. National Council accepting such accounting.

"'The Speaker of the House of Representatives.' House Ex. Doc. No. 182, 53d Cong., 3d sess.

"XX.

"The report and accounting made by said James A. Slade and Joseph T. Bender, referred to in the foregoing finding, is in the words and figures which appear in House Executive Document 182, Fifty-third Congress, third session. The conclusion thereof is as follows:

"'The foregoing statement covers, it is believed, every point at issue which can be raised under the treaties described in the articles of agreement [a number of demands made by the Cherokee Nation were disallowed], and the result of the finding is submitted in the following schedule:

Under the treaty of 1819:
    Value of three tracts of land containing 1,700 acres, at $1.25 per acre, to. be added to the principal of the "school" fund.................................... $2,125 00
    (With interest from February 27, 1819, to date of payment.)

Under treaty of 1835:
Amount paid for removal of Eastern Cherokees to the
Indian Territory, improperly charged to treaty fund... 1,111,284 70
(With interest from June 12, 1838, to date of payment.)
Under treaty of 1866:
Amount received by receiver of public moneys at Independence, Kans., never credited to Cherokee Nation.. 432 28
(With interest from January 1, 1874, to date of payment.)
Under act of Congress, March 3, 1893:
Interest on $15,000 of Choctaw funds applied in 1863 to
relief of indigent Cherokees, said interest being improperly charged to Cherokee national fund........ 20,406 25
With interest from July 1, 1903, to date of restoration
of the principal of the Cherokee funds, held in trust in
lieu of investments.'

" 'Washington, D. C., April 28, 1894.
(Signed) JAS. A. SLADE.
JOS. T. BENDER.'

"XXI.

"In arriving at the item of $1,111,284.70 the accountants among other tabulations made the following statement of the account.

" ' Figuring upon the basis stated in the ninth article, of the treaty of 1846, and following the Auditor's and Comptroller's figures in the accounting of December 3, 1849, and eliminating from the charges made against the total fund of, $6,647,067 the excess of payments over the amounts appropriated by the United States for that purpose, the true statement of the account is as follows:

For improvements............................... $1,540,572 27
For ferries....................................... 159,572 12
For spoliations................................... 264,894 09
For removal and subsistence, being the
amount actually provided and expended
for these purposes, and consisting of the
following items.................... { $335,105 91 } 1,382,172 91
{ 1,047,067 00 }
For debts and claims upon the Cherokee Nation.......... 101,348 31
For the additional quantity of land ceded to the Nation...... 500,000 00

| | |
|---|---:|
| For amount invested as the general fund of the Nation..... | 500,880 00 |
| For subsistence furnished after expiration of one year, under agreement that it should be charged to treaty fund.... | 172,316 47 |
| | 4,621,756 17 |
| For lands and possessions............................... | 5,000,000 00 |
| For spoliations......................................... | 264,894 09 |
| Balance of $600,000 applicable to removal............... | 335,105 91 |
| Appropriation of June 12, 1838......................... | 1,047,067 00 |
| | 6,647,067 00 |
| From which deduct charges as above................... | 4,621,756 17 |
| Balance to be distributed per capita................... | 2,025,310 83 |
| Deduct amount actually distributed as already explained... | 914,026 13 |
| Balance due ................................... | 1,111,284 70 |

"The sum of $914,026.13, actually distributed to the Eastern Cherokees in 1852, out of the above balance of $2,025,310.83, was appropriated as follows:

| | |
|---|---:|
| Amount found due by Treasury officials, under article 9, 1846, in the report of the Auditor and Comptroller of December 3, 1849................................... | $627,603 95 |
| Erroneous charge corrected by act of February 27, 1851.... | 96,999 42 |
| Erroneous charge account subsistence, corrected by Congress, September 30, 1850.......................... | 189,151 24 |
| | 914,026 13 |

"This amount of $914,026.13 was distributed solely to 14,098 Eastern Cherokees in the West and 2,133 Eastern Cherokees who remained East.

"Interest on the above sum of $914,026.13 at 5 per cent from June 12, 1838, was also appropriated by Congress and distributed per capita to said Eastern Cherokees in the same payment. . The balance to be distributed per capita according to the above report and which was not distributed, to wit, $1,111,284.70, is the sum of which the Eastern Cherokees complain they were deprived in the settlement of 1852; that while they received only $56.31 per capita, excluding interest,

they should have received the further sum of $1,111,284.70, or a total of $2,025,310.83, as appears in the above account rendered as the true balance under article 9, making them a total per capita of $124.78.

"The settlement made with the Old Settlers was as set forth in Finding XVII.

## "XXII.

" ' Neither the whole or any portion of the various sums with interest found and stated by the concluding schedule of the so-called Slade-Bender report to be due to the Cherokee Nation under the treaties and acts of Congress therein referred to have been paid to the Cherokee Nation, or to any officer, agent, or other person acting in its behalf.

"With the exception of the provision contained in the act of March 2, 1895, making appropriations for the legislative, executive, and judicial expenses of the Government, directing the Attorney General to review and report upon the conclusion of law disclosed in the account of Slade and Bender, and the passing of the provisions of the acts of July 1, 1902, and March 3, 1903, conferring jurisdiction upon the United States Court of Claims to hear and determine these causes, the Congress has taken no action whatever with respect to the said account of Slade and Bender or the amounts found due thereunder.

"Acting under said direction of March 2, 1895, above referred to, the Attorney General of the United States, on December 2, 1895, addressed a communication to the Congress wherein he advised that body of his disagreement with the conclusions reached by said Slade and Bender. Said communication of the Attorney General was, on December 2, 1895, by the Congress referred to the Committee on Indian Affairs and ordered to be printed, and the same appears in Senate Executive Document No. 16, Fifty-fourth Congress, first session."

May 18, 1905, the court "adjudged, ordered, and decreed

that the plaintiff, the Cherokee Nation, do have and recover of and from the United States as follows:

Item 1. The sum of............................................     $2,125 00
    With interest thereon at the rate of 5 per cent from
        February 27, 1819, to date of payment..
Item 2. The sum of...........................................     1,111,284 70
    With interest thereon at the rate of 5 per cent from
        June 12, 1838, to date of payment.
Item 3. The sum of...........................................     432 28
    With interest thereon at the rate of 5 per cent from
        January 1, 1874, to date of payment.
Item 4. The sum of..........................................     20,406 25
    With interest thereon from July 1, 1903, to date of payment.

"The proceeds of said several items, however, to be paid and distributed as follows:

"The sum of $2,125, with interest thereon at the rate of 5 per cent from February 27, 1819, to date of payment, less 5 per cent thereof contracted by the Cherokee Nation to be paid as counsel fees, shall be paid to the Secretary of the Interior in trust for the Cherokee Nation, and shall be credited on the proper books of account to the principal of the 'Cherokee school fund' now in the possession of the United States and held by them as trustees.

"The sum of $432.28, with interest thereon at the rate of 5 per cent from January 1, 1874, to date of payment, less 5 per cent thereof contracted by the Cherokee Nation to be paid as counsel fees, shall be paid to the Cherokee Nation, to be received and receipted for by the treasurer or other proper agent of said Nation entitled to receive it.

"The sum of $20,406.25, with interest thereon at the rate of 5 per cent per annum from July 1, 1893, to date of payment, less 5 per cent thereof contracted by the Cherokee Nation to be paid as counsel fees, shall be paid to the Secretary of the Interior and credited on the proper books of account to the principal of the 'Cherokee national fund,' now in the possession of the United States and held by them as trustees.

"The sum of $1,111,284.70, with interest thereon from June 12, 1838, to date of payment, less such counsel fees as may be chargeable against the same under the provisions of the contract with the Cherokee Nation of January 16, 1903, and such other counsel fees and expenses as may be hereafter allowed by this court under the provisions of the act of March 3, 1903, 32 Stat. 996, shall be paid to the Secretary of the Interior, to be by him received and held for the uses and purposes following:

"First. To pay the costs and expenses incident to ascertaining and identifying the persons entitled to participate in the distribution thereof and the costs of making such distribution.

"Second. The remainder to be distributed directly to the Eastern and Western Cherokees, who were parties either to the treaty of New Echota, as proclaimed May 23, 1836, or the treaty of Washington of August 6, 1846, as individuals, whether east or west of the Mississippi river, or to the legal representatives of such individuals.

"So much of any of the above-mentioned items or amounts as the Cherokee Nation shall have contracted to pay as counsel fees under and in accordance with the provisions of sections 2103 and 2106, both inclusive, of the Revised Statutes of the United States, and so much of the amount shown in item numbered two (2) as this court hereafter by appropriate order or decree shall allow for counsel fees and expenses under the provisions of the act of March 3, 1903, above referred to, shall be paid by the Secretary of the Treasury to the persons entitled to receive the same, upon the making of an appropriation by Congress to pay this judgment.

"The allowance of fees and expenses by this court under said act of March 3, 1903, is reserved until the coming in of the mandate of the Supreme Court of the United States."

The facts are stated *in extenso* in the report of the case, 40 C. Cl. 252, occupying some forty pages.

*Mr. Louis A. Pradt,* Assistant Attorney General, for the United States.

*Mr. Frederic D. McKenney* and *Mr. Charles Nagel,* with whom *Mr. Edgar Smith* was on the brief, for the Cherokee Nation.

*Mrs. Belva A. Lockwood* for the Eastern and Emigrant Cherokees.

*Mr. Robert L. Owen* and *Mr. William II. Robeson,* with whom *Mr. Robert V. Bell, Mr. James K. Jones, Mr. Mathew C. Butler* and *Mr. John Vaile* were on the brief, for the Eastern Cherokees.

MR. CHIEF JUSTICE FULLER, after making the foregoing statement, delivered the opinion of the court.

Of the four items of the amounts allowed, only one, that for $1,111,284.70, need be considered here.

1. The correctness of the account is conceded, and the question is whether the United States were properly held liable therefor. The Court of Claims ruled that the account rendered by Slade and Bender under the agreement between the United States and the Cherokee Nation, ratified by Congress, was neither an award nor an account stated, but that the United States were nevertheless liable in the circumstances for the balance found.

The case is thus put by Chief Justice Nott:

"But while the account was neither an award nor an account stated, it must be conceded that the scope of the accounting was intended to be as broad as the causes of action secured by the agreement to the Cherokee Nation 'the right within twelve months to enter suit against the United States in the Court of Claims for any alleged or declared amount of money promised but withheld by the United States from the

Cherokee Nation, under any of said treaties or laws, which may be claimed to be omitted from or improperly or unjustly or illegally adjusted in said accounting.' That is to say, the court, or the accountants, were to go behind statutory and treaty bars and receipts in full and were to consider 'any alleged or declared amount of money promised but withheld' 'under any of said treaties or laws.' This meant that there were to be no technical defenses set up, no pleas of *res judicata*, no releases or relinquishments, compromises or settlements; or it meant nothing. . . .

"Interpreted in the light of the long, sore controversy which had existed between the parties, it is plain that the Cherokees believed the agreement to mean (and the United States allowed them so to believe) that all of their claims and rights and equities were to be reopened and reëxamined *de novo;* and that upon the faith of that belief they made a cession of the Outlet.

"In the opinion of the court this case is simply one to recover purchase money upon a contract of sale. Ordinarily, in such a case, the cession would not be made, the deed would not be delivered until the purchase money is paid or secured or, at least, the amount be ascertained and liquidated. In this case both parties wanted to expedite the transaction. It was important for the United States that the cession of the territory should be made immediately; it was desirable for the Cherokee Nation that the purchase money should be paid soon. But, nevertheless, the Cherokee Nation had the right to immediate payment, and the agreement intended to secure to them the next thing to it—the right to an early payment. The accounting was merely a means to an end. The end was the immediate payment, as near as might be, of the whole consideration to be given for the cession of the Outlet. When the cession was made the purchase money was due; the only thing remaining, which was the object of the accounting, was to ascertain the exact amount. This is not the case of a party prosecuting an unliquidated debt, but a case of sale

and delivery and non-payment of the purchase money for the thing sold and delivered. The United States were willing to pay; the Cherokee Nation wanted the payment made at the earliest possible day; both parties agreed upon a method by which it should be paid as nearly immediately as was possible. The United States were to render their account 'without delay;' if the Cherokee Nation accepted it, the amount was to be appropriated by Congress; such 'appropriation to be made by Congress, if then in session, and if not, then at the session immediately following such accounting.' If the Cherokee Nation did not accept the accounting, or regarded it as incorrect or unjust, and carried it into the courts and recovered a judgment, Congress was to appropriate 'at the its next session after such case shall be finally decided.' Nothing was left to the ordinary uncertainties and procrastinations of legislation, and no agreement could have made the obligation to pay promptly more unequivocal and specific. Time was of the essence of the contract, so far as the words of the parties could make it.

"The court does not intend to imply that when the account of Slade and Bender came into the hands of the Secretary of the Interior he was bound to transmit it to the Cherokee Nation. On the contrary, the Cherokee Nation had not agreed to be bound by the report of the accountants and could not claim that the United States should be. The accountants were but the instrumentality of the United States in making out an account. When it was placed in the Interior Department it was as much within the discretion of the Secretary to accept and adopt it or to remand it for alterations and corrections as a thing could be. He was the representative of the United States under whom the agreement had been made, and he was the authority under which the account had been made out, and when he transmitted it to the Cherokee Nation his transmission was the transmission of the United States. When the account was thus received by the Cherokee Nation (May 21, 1894), the 'twelve months' of the agreement, within which

the Nation must consider it and enter suit against the other party in the Court of Claims, began to run, and with the Nation's acceptance of the account (December 1, 1894) the session of Congress at which an appropriation should be made became fixed and certain. The Secretary did not recall the account; the United States never rendered another, and the utmost authority which Congress could have exercised, if any, was, at the same session, or certainly within the prescribed 'twelve months,' to have directed the Secretary to withdraw the account and notify the Cherokee Nation that another would be rendered. The action of the Secretary of the Interior, combined with the inaction of Congress to direct anything to the contrary, makes this provision of the agreement final and conclusive. The Cherokee Nation has parted with the land, has lost the time within which it might have appealed to the courts, and has lost the right to bring the items which it regards as incorrectly or unjustly disallowed to judicial arbitrament, and the United States are placed in the position of having broken and evaded the letter and spirit of their agreement."

Weldon, J., concurred with the Chief Justice in a separate opinion. Peelle, J., concurred in the judgment, but rested his conclusion on the ground that the United States were liable " to pay the expense of removal " of the Eastern Cherokees from their eastern home to the Indian Territory, under the treaties of 1835–36 and 1846, 7 Stat. 478; 9 Stat. 871, and therefore to pay this conceded balance. The various treaties from 1817 down, the legislation, accountings, and proceedings were duly considered in arriving at the result reached. Wright, J., dissented.

We agree that the United States were liable, and think the liability might well be rested on both grounds, that is, that failing one it could be sustained on the other, but we do not deem it necessary to set forth in our own language what has already been so well stated by Chief Justice Nott and Judges Weldon and Peelle.

2. Recovery of the item of $1,111,284.70 was adjudged

"with interest thereon at the rate of five per cent from June 12, 1838, to date of payment," and it is contended that the Court of Claims erred in this allowance of interest.

Under the eleventh article of the treaty of 1846 the Cherokees agreed to submit to the Senate of the United States, as umpire, the question whether interest should be allowed on the sums found due them. The Senate of the United States, as umpire, on September 5, 1850, found that interest should be allowed, in the following resolution: "Resolved, That it is the sense of the Senate that interest at the rate of five per cent per annum should be allowed upon the sums found due to the Eastern and Western Cherokees, respectively, from the twelfth day of June, 1838, until paid."

The Cherokees who had emigrated prior to 1835, with accessions to that date, were known as the "Old Settlers," or "Western Cherokees," and in the case of the *United States v. Old Settlers*, 148 U. S. 427, this court said in respect of the claim for interest:

"By the second resolution adopted by the Senate, as umpire, September 5, 1850, it was decided that interest should be allowed, at the rate of five per centum per annum, upon the sum found due the Western Cherokees, from June 12, 1838, until paid. As before stated, our conclusion is that the sum then found due was less than should have been found by the amount of $212,376.94.

"Under section 1091 of the Revised Statutes, no interest can 'be allowed on any claim up to the time of the rendition of judgment thereon by the Court of Claims, unless upon a contract expressly stipulating for the payment of interest;' and in *Tillson* v. *United States*, 100 U. S. 43, it was held that a recovery of interest was not authorized under a private act referring to the Court of Claims a claim founded upon a contract with the United States, which did not expressly authorize such recovery. But in this case, the demand of interest formed a subject of difference while the negotiations were being carried on, the determination of which was provided for

in the treaty itself; that determination was arrived at as prescribed, was accepted as valid and binding by the United States, and was carried into effect by the payment of $532,896.90, found due, and of $354,583.25 for interest.  9 Stat. 556, c. 91.

"In view of the terms of the jurisdictional act and the conclusion reached in reference to the amount due, it appears to us that the decision of the Senate in respect of interest is controlling, and that, therefore, interest must be allowed from June 12, 1838, upon the balance we have heretofore indicated, but not upon the item of $4,179.26, which stands upon different ground."

The Congress of the United States on numerous occasions had recognized the force of the decision of the Senate and made appropriations accordingly, appropriating the funds due as interest.

On September 30, 1850, Congress appropriated to the Eastern Cherokees, in reimbursing an amount improperly charged the treaty fund for subsistence, the sum of $189,422.76, with the provision:

"That interest be paid on the same at the rate of five per cent per annum, according to a resolution of the Senate of the fifth of September, eighteen hundred and fifty." 9 Stat. 544, 556.

On February 27, 1851, Congress, in appropriating the amount of the *per capita* then conceded to be due the Eastern Cherokees, to wit, $724,603.37, provided as follows:

"And interest on the above sum, at the rate of five per centum per annum, from the twelfth day of June, eighteen hundred and thirty-eight, until paid, shall be paid to them out of any money in the Treasury not otherwise appropriated." 9 Stat. 570, 572.

Congress on September 30, 1850, in appropriating the amount of the *per capita*, then conceded to be due the Old Settlers, provided:

"That interest be allowed and paid upon the above sums

due respectively to the Cherokees and Old Settlers, in pursuance of the above-mentioned award of the Senate, under the reference contained in the said eleventh article of the treaty of sixth August, eighteen·hundred and· forty-six." 9 Stat. 544, 556.

The question of interest was a "subject of difference while the negotiations were being carried on, the determination of which was provided for in the treaty itself" in 1846, and in the "agreement itself" in 1891, and is the same in principle as in the case of the Old Settlers.

3.. Was the recovery given proper destination by the decree?

We refer to the same item, as there is really no controversy over the other three items, and the criticism as to the payment of item three is not material. If no proper agent of the Cherokee Nation to receive the $432.28 can be found, it may be received by the United States as trustee.

The jurisdictional act of March 3, 1903, provided that "both the Cherokee Nation and said Eastern Cherokees, so-called, shall be made parties to any suit which may be instituted against the United States under said section upon the claim mentioned;" and authorized the court "to render a judgment in favor of the rightful claimants, and also to determine, as between the different claimants to whom the judgment so rendered equitably belongs, either wholly or in part."

In the petition filed by the Cherokee Nation in this case it is declared that the Cherokee Nation is "a body politic," and "is, as such, the 'Cherokee tribe' mentioned in section 68 of the act of Congress aforesaid [July 1, 1902, 32 Stat. 726], and authorized thereby to bring this proceeding." But. the language of the section is that jurisdiction is conferred to adjudicate "any claim which the Cherokee tribe or any band thereof, arising under treaty stipulations, may have against the United States," and even if it were conceded that the Cherokee Nation could be treated as a body politic, not as a body corporate, but in the sense of a governmental·community, we should say "the Cherokee tribe or any band

thereof" means the Cherokee people as a people, or any band thereof, and not the Cherokee Nation as a body politic.

It should be observed that the term "Cherokee Nation" has been used as representing the people themselves; the government of the Cherokees; and the Government as trustee for all of its people, or for some of them as their rights might appear.

In the treaty of July 2, 1791, the "Cherokee Nation" was described as "all the individuals comprising the whole Cherokee Nation of Indians." In the treaty of 1835 these Indians are referred to as the "Cherokees" and as "The Cherokee Nation." In the treaty of 1846 as "The Cherokee Nation," "The Cherokee People," and "The Cherokees."

Under the first article of the treaty of 1846 the lands of the Cherokee Nation belonged to the whole Cherokee people. The lands sold east of the Mississippi river belonged to the Cherokee people as then existing as communal property. The Western Cherokees, so called, that is to say, the Old Settlers, were paid for their interest in those lands as communal owners. 148 U. S. 427. They were paid individually, a community within a community.

Mr. Chief Justice Nott treats of this matter thus:

"While the United States have always, or nearly always, treated the members of an Indian tribe as communal owners, they have never required that all the communal owners shall join in the conveyance or cession of the land. From the necessities of the case, the negotiations have been with representatives of the owners. The chiefs and headmen have ordinarily been the persons who carried on the negotiations and who signed the treaty. But they have not formed a body politic or a body corporate, and they have not assumed to hold the title or be entitled to the purchase money. They have simply acted as representatives of the owners, making the cession on their behalf, but allowing them to receive the consideration *per capita.* In the present case the Cherokee Nation takes the place, so far as communal ownership is in-

volved, of the chiefs and headmen of the uncivilized tribes. This, too, is consonant with the usage of nations. The claims of individuals against a foreign power are always presented, not by them individually, but by their government. The claims are pressed as international, but the money received is received in trust, to be paid over to the persons entitled to it.

"As to those Cherokees who remained in Georgia and North Carolina, in Alabama and Tennessee, they owe no allegiance to the Cherokee Nation and the Nation owes no political protection to them. But they, as communal owners of the lands east of the Mississippi, at the time of the treaty of 1835, were equally interested, with the communal owners who were carried to the West, in the $5,000,000 fund which was the consideration of the cession, so far as it was to be distributed *per capita*. The Cherokee Nation was not bound to prosecute their claims against the United States for the unpaid balance of the $5,000,000 fund, but their rights were inextricably interwoven with the rights and equities of the Cherokees who were citizens of the Nation, and the Nation properly made no distinction when parting with the Outlet but demanded justice from the Cherokee point of view for all Cherokees who had been wronged by the non-fulfillment of the treaty of New Echota. As to these Eastern non-resident Cherokee aliens the Nation acted simply as an attorney collecting a debt. In its hands the moneys would be an implied trust for the benefit of the equitable owners.

"After a careful consideration of the circumstances and conditions of these cases, the court is of the opinion that the moneys awarded should be paid directly to the equitable owners."

And after referring to the present status of the Cherokee Nation as about to terminate, the Chief Justice says:

"In this condition of affairs the court must regard the Cherokee Nation as in a condition somewhat analogous to that of a trustee or receiver who has become insolvent; that is to say, as a person who should not be entrusted with the

receipt, and distribution of the moneys belonging to other persons."

The Court of Claims decreed that after deducting counsel fees, costs and expenses, the sum of $1,111,284.70, with interest, should be paid to the Secretary of the Interior, to be by him received and held for the uses and purposes of paying costs and expenses as stated, and then distributing the remainder "directly to the Eastern and Western Cherokees, who were parties either to the treaty of New Echota, as proclaimed May 23, 1836, or the treaty of Washington of August 6, 1846, as individuals, whether east or west of the Mississippi river, or to the legal representatives of such individuals."

The eighth finding of fact was as follows:

"The Cherokee Indians who removed west of the Mississippi prior to May 23, 1836, were called 'Western Cherokees.' After the removal, under the treaty of 1835–36, of the Cherokees who had remained in the Cherokee country east of the Mississippi to the lands west of the Mississippi, the term 'Western Cherokees' was no longer distinctive, and the Cherokees who had theretofore been known as such were thereafter popularly known as 'Old Settlers.'

"The Cherokees who were domiciled east of the Mississippi river at the time of the making of the treaty of 1835–36, according to the census just then completed, were thereafter known as 'Eastern Cherokees,' the great body of whom subsequently, in 1838, moved to the lands west of the Mississippi."

So far as the "Old Settlers" are concerned, they have been fully paid and cannot be allowed to participate in this distribution. There had been a settlement with these Cherokees, which was reopened in the *Old Settlers* case, and they were allowed to assert any and all claims on their part against the United States. Judgment was thereafter rendered as to a portion of these claims in their favor, 148 U. S. 427, which judgment was thereafter paid in full by the United States; so that these Old Settlers have no standing in this action. And,

indeed, they never had nor asserted any interest whatever in the claim herein involved and are not claimants. In the settlement of 1851, the cost of removal with which they were charged, did not diminish the five million dollar treaty fund but came entirely from the $600,000 added to that fund by the third supplemental article of the treaty of New Echota, and the payment that was made to them pursuant to the fourth article of the treaty of 1846 was not a third of the residuum of the treaty fund, but a sum equal to one-third. It was the Eastern Cherokees only who were interested in that residuum, and so article nine of that treaty provided for payment to the Eastern Cherokees of that balance, and for a fair and just settlement of all moneys due to the Cherokees and payment of the same *per capita* to the Eastern Cherokees. The Cherokee Nation, as such, had no interest in the claim, but officially represented the Eastern Cherokees.

The act of February 27, 1851, appropriating the amount due on the accounting under article nine of the treaty of 1846, provided that it should be in full satisfaction of all claims and demands of the Cherokee Nation and that a receipt in full should be given. The receipts as given were signed by the individual Eastern Cherokees.

We concur with the Court of Claims in the wisdom of rendering judgment in favor of the Cherokee Nation, subject to the limitation that the amount thereof should be paid to the Secretary of the Interior to be distributed directly to the parties entitled to it, but we think that the terms of the second subdivision of the fourth paragraph of the decree, in directing that the distribution be made to "the Eastern and Western Cherokees," are perhaps liable to misconstruction, although limited to those "who were parties either to the treaty of New Echota as proclaimed May 23, 1836, or the treaty of Washington of August 6, 1846, as individuals, whether east or west of the Mississippi river." This should be modified so as to direct the distribution to be made to the Eastern Cherokees as individuals, whether east or west of the Mississ-

ippi, parties to the treaties of 1835–36 and 1846, and exclusive of the Old Settlers.

In view of the language of the jurisdictional acts of 1902 and 1903 in respect of the Cherokee Nation, we are not disposed to interfere with the Court of Claims in the allowance of fees and costs.

It is true that in the replication of the Cherokee Nation to the petition of the Eastern Cherokees this paragraph occurs:

"It denies that the Cherokee Nation in securing the accounting under the agreement of December 19, 1891, did so on behalf of the Eastern Cherokees referred to, and for their exclusive use and benefit; and further denies that if it had collected or hereafter shall collect such moneys, the same would have been or will be in its hands an implied trust for the benefit of the Eastern Cherokees exclusively or otherwise."

It is also true that by the acts of June 7, 1897, June 28, 1898, and July 1, 1902, the Cherokee Nation was practically incapacitated from acting as trustee, and by section 63 of the Cherokee allotment act, 32 Stat. 725, c. 1375, it was provided that "the tribal government of the Cherokee Nation shall not continue longer than March fourth, nineteen hundred and six." But by joint resolution of March 2, 1906, Congress provided as follows:

"That the tribal existence and present tribal governments of the Choctaw, Chickasaw, Cherokee, Creek, and Seminole tribes or nations of Indians in the Indian Territory are hereby continued in full force and effect for all purposes under existing laws until all property of such tribes, or the proceeds thereof, shall be distributed among the individual members of said tribes unless hereafter otherwise provided by law."

Nevertheless, taking the entire record together, the various treaties, and acts of Congress, and of the Cherokee Councils, and the language of the jurisdictional acts of 1902 and 1903, we leave the decree as it is in respect to counsel fees and costs.

4. The Eastern and Emigrant Cherokees, in respect of whom it is stated in their petition, "That they number about 4,500

persons, more or less, all Eastern Emigrant Cherokees, residing for the most part in Cherokee, Graham, Swain, Clay, and Macon Counties, North Carolina, some in north· Georgia, northern Alabama, and eastern Tennessee, together with about 1,500 emigrants, portions of their various families, gone West, nearly all of whom have been recognized as citizens and who compose a large portion of those persons heretofore known as the Eastern band of Cherokee Indians of North Carolina, and others of the same class, whose names or those of whose ancestors may be found on the rolls of 1835 and 1838," asked that one-fourth part of the whole sum recovered be set apart for them as their distributive share. But we think they are only entitled to receive the *per capita* payment with the Eastern Cherokees, and should obtain that payment accordingly.

The result is, that with the modification of the second subdivision of the fourth paragraph of the decree, relating to the $1,111,284.70 with interest, above indicated, the decree of the Court of Claims is

*Affirmed.*