Peelle, Ch. J.,
delivered the opinion of the court:
By a provision in the Indian appropriation act March 1, 1907 (34 Stat. L., 1015, 1028), set out in Finding X, jurisdiction was conferred upon the court, with the right of appeal, “ to determine the validity ” of certain acts of Congress passed since July 1, 1902, respecting the rights, privileges, and immunities of Cherokee Indians, citizens of the United States, in and to the common property of the Cherokee Nation on September 1,1902, the date fixed by the act of July 1, 1902 (32 Stat. L., 716), for the allotment of their lands, which date of allotment was, by the act of April 26, 1906, as amended by the act of June 21,1906 — to apply to Cherokee Indians — extended to March 4, 1906 (34 Stat. L., 137 and 341). Herein lies the controversy.
*150 The court, on application therefor, over the objections of the claimants, permitted the Cherokee Nation, through its principal chief, to file its intervening petition, and its national attorney to participate in the argument.
The validity of the statutes involved might perhaps have been determined on demurrer had the defendants so elected; but they, deeming the action of the Cherokee council providing for the appointment of three commissioners to secure legislation by Congress providing for the enrollment of children born of enrolled Cherokee parents after September 1, 1902, essential, tendered the general issue, and accordingly both parties have asked the court to make findings of fact, which we have done, though the findings are mainly deductions from statutes and treaties, and may not be deemed necessary by the Supreme Court, in case of appeal, to deter-' mine the validity of the acts in question.
By virtue of the act March 3, 1901 (31 Stat. L., 1447), amending section 6, act February 8, 1887 (24 Stat. L., 390), the Cherokees and other Indians in the Indian Territory were made citizens of the United States “ without in any manner impairing or otherwise affecting the right of any such Indian to tribal or other property.”
The act of July 1,1902, in compliance with its terms (secs. 74 and 75), was submitted to the Cherokee people for ratification by popular vote, and was so ratified August 7,1902, and, as in said act provided, was duly certified to the President of the United States August 12, 1902. The claimants, as well as the defendants and Cherokee Nation, intervenor, concede the validity of said act, although by virtue of the Indian appropriation act of March 3, 1901 (31 Stat. L., 1073), the Secretary of the Interior was authorized to and did fix the time for the enrollment as of July 1, 1902, which date was extended by said act of July 1, 1902, to September 1, 1902.
The court deems it unnecessary to consider in detail the manner and method of the appraisement of the lands and the making of the roll upon which the allotments were made or the various acts of Congress passed prior to July 1, 1902, respecting the creation and authority of the Commission to the Five Civilized Tribes, diminishing the tribal power, and subjecting the legislation of the nation to the approval of the *151 President of the United States, except so far as they show the purpose of Congress in dealing with the tribal government as well as with the tribal property of the Cherokee Nation. It is enough to say that the allotment under the act of July 1, 1902, with the consent of the Cherokee people, was authorized, a roll was made of all Cherokee citizens as of September 1, 1902, and approved by the Secretary of the Interior, under which roll allotments to each individual were made as provided by section 11 of the act of “ lands equal in value'to one hundred and ten acres of the average allottable lands of the Cherokee Nation,” the value of which land, in the manner provided by section 9 of the act, was fixed at $825.60.
After said allotments had been made there remained un-\ allotted lands sufficient for about 3,800 such average allot-\ ments, which unallotted lands, together with the undistributed funds in the United States Treasury, to the credit of the Cherokee Nation — exceeding $2,000,000 — are ample, as provided by the act of April 26, 1906, as amended to equalize the allotments of all persons on the final or extended roll of Cherokee citizens as of March 4, 1906.
As set forth in Findings XI, XII, and XIII, said acts of April and June, 1906, were passed by Congress at the request and on the petition therefor of the representatives of the Cherokee Nation appointed therefor with the approval of the President of the United States (.31 Stat. L., 1071), and, therefore* so far as the nation could act in behalf of its citizens in that respect their consent, if that were, necessary, was given to said acts.
The claimants’ contention is that by virtue of the citizenship of the Cherokees under the act of March 3, 1901, and the allotment act of July 1, 1902, those enrolled under said\ act as- of September 1, 1902, thereby acquired vested rights j in and to all the common property of the Cherokee Nation, j and having thereby acquired such vested rights it was not within the power of Congress to divest them thereof; that section 2 of said act of April 26, 1906, as amended, seeks to take the private property of the claimants, citizens of the United States, without due process of law, and is therefore 1 *152 in violation of the fifth amendment to the Constitution of the United States.
On the part of the defendants, as well as of the Cherokee Nation, intervenor herein, it is contended that in respect to the tribal property, i. e., the unallotted lands and undistributed funds of said nation, the power of Congress is plenary.
The question, stripped of unnecessary verbiage, is: Did Congress by the act of July 1, 1902, in authorizing, with the consent of the members of the Cherokee Nation, the allotment and distribution of their common property as of September 1, 1902, thereby exhaust the conceded, hitherto, paramount authority of the United States over the tribal property of said nation?
For many years prior to said allotment act of July 1, 1902, ¡and subsequent thereto, the Cherokee Nation, in the Indian Territory, held title to the lands sought to be allotted by patent issued by the United States December 31, 1838, in conformity with treaties then existing between them and said nation, subject, however, to the conditions that the nation should not become extinct or abandon possession of said land; and in the case of Cherokee Nation v. Journeycake (155 U. S., 196, 207) it was held that “ by that patent, whatever of title was conveyed was conveyed to the Cherokees, as a nation, and no title was vested in severalty in the Cherokees, or any of them.” — (Cherokee Trust Fund, 117 U. S., 288.)
In Cherokee v. Hitchcock (187 U. S., 294, 307) it was said: “ Whatever title the Indians have is in the tribe and not in the individual, although held by the tribe for the common use and benefit of all the members.”
The Cherokee constitution provides that “ the lands of the Cherokee Nation shall remain common property until the national council shall request the survey and allotment of the same in accordance with the provisions of article twenty of the treaty of nineteenth July, eighteen hundred and sixty-six, between the United States and the Cherokee Nation.” (Sec. 2 of amendment to art. 1, constitution Cherokee Nation.)
*153 By section 15, act March 8, 1898 (27 Stat. L., 612, 645), quoted in the case of the Matter of Heff (197 U. S., 488, 500) — as indicating the interest the United States claimed therein — it is provided that upon the allotment “ the rever-sionary interest of the United States therein shall be relinquished and shall cease.”
The members of said nation residing in the Indian Terri- / tory were therefore communal owners of the lands and funds ! of said nation on July 1, 1902, when the allotment act of I that date was passed, as they were when the roll was made/ thereunder as of September 1, 1902, if not later; and had! all of said lands and funds been actually allotted and dis-s tributed as of that date nothing would have remained upon which the subsequent acts, by their terms, could operate, The amount of land allotted was not determined by the commissioners, but was fixed in section 11 of the act.
On the other hand, each .member of the nation is entitled, by reason of his communal ownership, to an equal share with his coowners in the common property, but the nature of the title is such that no right can ves.t in the individual to such share before allotment, even though he be a citizen of the United States. Nor is such right to the share enlarged or transformed into a vested right by the act of July 1, 1902, providing for the .method and time of making such allotment, as, by section 31 of the act, the right of a member dying prior to September 1, 1902, becomes extinct and passes to the tribe in general. Nor is it necessary to this case for the court to consider whether the allottees in the allotments made under said act as of September 1, 1902, have vested ~\ rights in the shares so allotted further than to say that by 1 section 21 of said act it is provided that the certificate shall \ be conclusive evidence of the right of the allottees to the Í tract of land described therein; but said allotments are not ) sought to be affected by the acts in question; and there yet ’’ remain unallotted lands and undistributed funds with which/ to equalize, as provided by the act of April 26, 1906, as amended, the allotments of all persons whose names appear upon the final or extended roll as of March 4, 1906.
Section 63 of the act of July 1, 1902, provides that “ the tribal government of the Cherokee Nation shall not con *154 tinue longer than March fourth^ nineteen hundred and six; ” but by joint resolution of Congress, March 2, 1906 (34 Stat. L., 822), the tribal existence and present tribal governments of the Cherokee Nation and other civilized tribes in the Indian Territory were “ continued in full force and effect for alb purposes under existing laws until all property of such tribes, or the proceeds thereof, shall be distributed among the individual members of said tribes, unless hereafter otherwise provided by law.” And thereafter, by section 28 of the act of April 26, 1906, the tribal existence and present tribal government of said nation was, with certain restrictions therein specified, “ continued in full force and effect for all purposes authorized by law until otherwise provided by law.”
Therefore, in considering the questions involved, we shall assume the validity of those provisions continuing the tribal existence and tribal government of the Cherokee Nation in force and effect until all property of said nation shall have been distributed among the individual members thereof.
We must first note that the enrollments under the act of April 26, 1906, as amended, were made as of March 4, 1906, the date when, by the act of July 1, 1902, the tribal government of the Cherokee Nation was to cease. The evident purpose of Congress by said act of April, 1906, as amended, was to enroll all Cherokee citizens living as of the date when the tribal government was to cease.
While it was within the power of Congress, by the act of July 1, 1902, to fix the date for enrollment prior to the time therein fixed for the termination of the tribal government, no sufficient reason, other than the act itself, can be urged therefor on either legal or equitable grounds, and this was doubtless the view of Congress when, by the acts of April and June, 1906, the time of enrollment was extended to the date fixed for the termination of the tribal government. This act is in harmony with the act June 28, 1898 (30 Stat., L., 495, 513), respecting the Choctaw and Chickasaw nations, wherein it is provided that: “ It is further agreed that the Choctaws and Chickasaws, when their tribal governments cease, shall become possessed of all the rights and privileges of citizens of the United States.”
*155 True, the acts of April and June, 1906, were passed after tlie date fixed for the termination of the tribal government, but their operation respecting those to be enrolled was limited to March 4, 1906. Hence but for these acts children of enrolled Cherokee parents under the act of July 1, 1902, though living during the existence of the tribal government, would have been denied their rights as communal owners in the common property; and it is no answer to say that the communal rights of the members of the nation in the lands were severed by the act of July 1, 1902, and thereby became vested as of the date of enrollment thereunder, for the tribal government was to continue until March 4, 1906, of which the allottees were bound to take notice; and so long as the tribal government existed no right as between themselves or as against the United States could vest in severalty in the common or unallotted property. In other words, nothing short of actual allotment in severalty, as provided by law, will give the individual members of the nation vested rights as against the United States. The act does not seek to divert the lands from the communal owners and give them to strangers, but merely extends the time for allotment so as to include and equalize allotments to all those living on the date fixed for the termination of the tribal government.
The relation between the Government and the Indians being that of a superior dealing with an inferior, the Government may discontinue that relation at any time, but it is for Congress and not for the courts to determine when that shall take place. Nor is the power of the Federal Government-to protect the Indians “ dependent upon the preservation of tribal relations.” (Matter of Heff, 197 U. S., 488, 496.)
Although the Cherokee Nation as a body politic, with a written constitution and system of laws for the protection of persons and property within its jurisdiction, has been recognized by the United States in their treaties with them, nevertheless the Cherokees since the treaty between them and the United States of November 28, 1785 (7 Stat. L., 18), have acknowledged that they were under the protection of the United States and-no other sovereign.
*156 A similar provision was in the treaty made with them as a nation July 2, 1791 (7 ibid., 39), (Cherokee Trust Funds, 117 U. S., 288, 295; Delaware Indians v. Cherokee Nation, 197 ibid., 127).
The court, in the first of the cases cited, makes reference to and comments on the various treaties between the Cherokees before and after their separation and their subsequent union, in all of which treaties the paramount authority of the United States for their protection is acknowledged. But independent of such treaties and their acknowledgment, the Cherokees and other Indians have been, since our Government was organized, subject to the paramount authority of the United States, exercised by Congress; and they and the territory occupied by them being within the geographical limits of the United States have at all times been subject to the laws of Congress enacted for their protection as well as for the protection of the people with whom they come in contact (Worcester v. Georgia, 6 Pet., 515). In other words, the United States, had they so elected, might from the first,' without the consent of the Indians, have controlled them and their tribal property by acts of Congress instead of by treaties (United States v. Kagama, 118 U. S., 375, 379). And the purpose to control them by acts of Congress instead of by treaties was indicated by the act of March 3, 1871 (now Rev. Stats., sec. 2079).
Referring to that section the court, in the Matter of Heff (197 U. S., 488, 498), said: “ From that time on the Indian tribes and the individual members thereof have been subject to the direct legislation of Congress, which, for some time thereafter, continued the policy of locating the tribes on separate reservations and perpetuating the communal or tribal life.”
Further, in commenting on the power of Congress in that same case, the court, quoting from the case of Lone Wolf v. Hitchcock (187 U. S., 553, 565), said: “Plenary authority over the tribal relations of the Indians has been exercised by Congress from the beginning, and the power has always been deemed a political one, not subject to be controlled by the judicial department of the Government.”
*157 And after quoting numerous authorities in support of that holding, and other authorities looking to the protection of the Indians, the court said: “ But none of the decisions affirming the protection of the Indians questioned the full power of the Government to legislate in respect to them.”
Furthermore, in the case of the Cherokee Nation v. Hitchcock (187 U. S., 294) the court held, in effect, that Congress, by the act of June 28, 1898, “ practically assumed the full control over the Cherokees as well as the other nations constituting the Five Civilized Tribes, and took upon itself the determination of membership in the tribes for the purpose of adjusting their rights in the tribal property.” (See also Delaware Indians v. Cherokee Nation, 193 U. S., 127.)
To the same effect also is the case of Wallace v. Adams (204 U. S., 415) respecting citizenship in the Indian tribes.
In the case of United States v. Rickert (188 U. S., 432, 445), in commenting on the contention that the State had conferred upon the Indians the right of suffrage and for that reason they ought to share theo burdens of taxation like other people, the court said: “ These are considerations to be addressed to Congress. It is for the legislative branch of the Government to say when these Indians shall cease to be dependent and assume the responsibilities attached to citizenship. That is a political question, which the courts may not determine. We can only deal with the case as it exists under the legislation of Congress.” And that case was quoted with approval in the case of Matter of Heff (197 U. S., 488, 497).
Again, in the case of McKay v. Kalyton (204 U. S., 458, 468), the court said: “The Riclcert case settled that, as the necessary result of the legislation of Congress, the United States retained such control over allotments as was essential to cause the allotted land to enure during the period in which the land was to be held in trust 'for the sole use and benefit of the allottees.’ ”
It is due to the counsel for the claimants to say that we do not understand them as controverting the paramount authority of the United States over the tribal property of the Cherokees; but their contention is that as Congress conferred citizenship upon the Cherokees, and thereafter by the act of July 1,1902, authorized the allotment and distribution of the *158 common property as of September 1, 1902 — to those living-on that date — their right in and to the respective shares so authorized to be set apart thereby became vested as of September 1, 1902, and hence no tribal property remains upon which the act of April, 1906, as amended, can operate.
In this view of the case the act might be held valid, though inoperative to effect its purpose. But their further contention is that section 2 of the act of April, 1906, seeks to deprive the Cherokee citizens enrolled as of September 1, 1902, of the vested rights acquired by them under the act of July 1,1902, to their respective shares in all the common property, whether actually set apart as of September 1, 1902, or not; and in this respect no distinction is made between the lands so held and the money in the Treasury to the credit of the nation, though it is conceded that none of the money so held has been actually distributed, and that lands enough remain, if the act of 1906 is valid, to make allotments upon the basis already made under the act of 1902, to about 3,800 persons, leaving 2,810 persons who would receive $651.20 each out of the fund so held.
In the contention thus made the claimants of necessity divorce the Government from the control of the Indians and their property and place them upon an equality of rights with other citizens of the United States, although their tribal .government, as provided by the act under which they claim, was not to cease until March 4,1906.
We must assume that Congress had some purpose in keeping alive the tribal government until March 4, 1906, and by subsequent acts continuing the same in full force for all purposes under existing laws until all the lands of the nation and the funds to its credit shall have been allotted and distributed. By these acts the Government asserted its continued guardianship until the final distribution of the common property; and under the authorities cited we think it can not be successfully controverted that if before any allotments had been made under the act of 1902, Congress by amendment had inserted the date March 4, 1906, in lieu of September 1, 1902, allotments as of the latter date would have been valid and éffective to bind all, as under the authorities cited no rights could vest in severalty in communal *159 property by the mere force of a statute. If they could, then, under the act of March 3,1901, supra, they would have vested as of July 1, 1902, the date fixed by the Secretary of the Interior by authority of said act of 1901. But as before stated the case here proceeds upon the theory of the validity of the extension to September 1, 1902.
Under the authorities cited we do not believe rights became vested in the Cherokees until there was an actual severance of the communal property and the issuance of a patent, and then only to the extent of the property therein actually conveyed to the allottees pursuant to law.
Section 2, act of April 26, 1906, as amended, in terms applies only to miners living March 4,1906, whose parents had been enrolled; and as all Cherokee citizens living on September 1, 1902, had been enrolled, it follows that the act applies only to minors born to such parents after September 1, 1902, who were living on March 4, 1906. In other words, the act of 1906 does not interfere with the roll or the allotments made under the act of 1902, but adds to the roll the minors so born to share equally with the allottees under said act— not to take from such. allottees what has been set apart to them, but to apply the unallotted lands and undistributed funds so as to equalize allotments of persons on the final or extended roll as of March 4, 1906.
Our attention has been called to the case of Garfield, Secretary of the Interior, v. United States, ex relatione Goldsby, decided by the Supreme Court November 30, 1908, wherein the name of Goldsby, a Chickasaw Indian who had received a certificate entitling him to a patént, had been stricken from the allotment roll without notice, and the court held that mandamus was the proper remedy to restore his name to the roll, as the Secretary of the Interior was required to perform a plain official duty requiring no exercise of discretion. Clearly this was right, as Goldsby was on the roll and had received a certificate of allotment, which, under section 23 of the act of July 1, 1902 — under which he was enrolled— (32 Stat. L., 641), was declared to be conclusive evidence of his right to “ the tract of land described therein.”
In the present case certificates had been issued to the allot-tees, which, under section 21 of the act of July 1, 1902, *160 respecting the Cherokees, were declared to. be “ conclusive evidence of the right of an allottee to the tract of land described therein,” of which, under said section, they were entitled to be put in possession.
By sections 58 and 59 of said act the issuance of patents was provided for with the approval of the Secretary of the Interior; and assuming that the title to the tracts of land so described in the certificates became vested in the allottees severally it was, nevertheless, subject to the provisions of sections 14 and 15 prohibiting alienation thereof before the expiration of five years from the date of ratification of the act, and to section 72 against renting their allotments for grazing purposes for more than one year or for agricultural purposes for more than five years, except with the approval of the Secretary of the Interior, when such allotments may be leased for longer terms for either grazing, agricultural, or mineral purposes.
By section 11 of said act the Commission to the Five Civilized Tribes was not only limited in the allotments to “ land equal in value to one hundred and ten acres of the average allottable lands of the Cherokee Nation,” but section 18 of the act makes it unlawful, after ninety days from the date of ratification, “ for any member of the Cherokee tribe to inclose or hold possession of, in any manner, by himself or through another, directly or indirectly, more lands in value than that of one hundred and ten acres of average allot-table lands of the Cherokee Nation; ” and for any violation thereof he “ shall be deemed guilty of a misdemeanor,” punishable by fine of not less than $100, and “ shall forfeit possession of any property in question.”
While it may be that Congress at the time of the passage of the act intended to allot all the lands held by the Cherokee Nation except those reserved under section 24, still by section 72 of the act provision was made for the collection by the Secretary of the Interior of a reasonable grazing tax from the owners of cattle grazed “ on lands not selected as allotments by citizens,” and, too, for the benefit not of the allottees as of September 1, 1902, severally or collectively, but for the benefit of the tribe, which of necessity included all of its members then living. The act being silent as to the *161 disposition of the unallotted lands, as the claimants concede, further legislation was necessary therefor — and this, also, the claimants concede; but they in effect say that Congress by the act of July 1, 1902, limited their power to allot such lands to any but the allottees under said act.
The omission in the act to provide for unallotted lands was supplied by section 16 of the act of April 26,1906, which, in substance, provides for the sale of- any unallotted lands and the payment of the proceeds thereof into the Treasury of the United States to the credit of the tribe.
Certainly Congress did not intend that rights should become vested in lands for the allotment or other disposition of which no provision was made in the act, nor do we believe the language of the act of 1902 is susceptible of such construction. It may be inferred that Congress, by section 5 of the act of April 26, 1906, as amended, providing that patents or deeds to allottees should be recorded, “ and when so recorded shall convey legal title,” thereby intended that allottees should acquire legal title only after the patents or deeds to them, respectively, had been recorded.
If the contention of the claimants is well founded then, by the act of July 1, 1902, the claimants, as citizens of the United States, acquired as against the United States vested rights to an equal share in all the lands held by the Cherokee Nation as of September 1, 1902; and if so, then the title in the Cherokee Nation was divested and merged in the several allottees, subject only to the execution of the muniments of title. But certainly it would not be contended that a mandamus would lie to compel an allotment of the remaining lands because, forsooth, Congress, while intending to make provision for the allotment of the lands to those living September 1, 1902, had failed. Statutes frequently fail of their purpose and further legislation • becomes necessary; and if necessary, then it is for Congress, within their constitutional powers, to determine what that legislation shall be. Not that Congress have the power to take the land of one person and give it to another, but that among communal owners Congress may say when the lands so owned may be allotted, and may, for reasons satisfactory to them, of which they are the judge, extend the time for the allotment or disposition *162 of the communal or tribal property so as to include all living on the date when the tribal government ceases.
When a citizen has acquired a right to the use and possession of property according to law, or when such right has become complete and consummated, requiring no further act to enable him to enjoy it, such right is within the protection of due process of law and therefore vested. That is to say, he has acquired a right in property which is enforceable in favor of a definite person. But conceding the application of the rule stated to the allottees in the land set apart to them under the act of July 1, 1902, it will not apply to the unallotted lands to which they have acquired no individual right of possession or enjoyment and therefore not within the protection of due process of law. In other words, the rights of said allottees under the act of July 1, 1902, in and to the unallotted lands after September 1, 1902, remained the same as they were before that date.
Assuming that the Cherokees by reason of the ratification by them of the act of July 1, 1902, thereby acquired contractual rights in and to the quantity of land therein authorized to be set apart, such rights can not be enlarged so as to include lands not allotted, and for which no provision was made. Therefore such lands remained subject to future legislation. Nor did the citizenship of the allottees deprive Congress of the right to control the remaining tribal property. (Cherokee Nation v. Hitchcock, supra.)
"While the right to private property is a sacred right it has its limitations and restrictions. “ It must have some regard to the general welfare and public policy; it can not be a right which is to be examined, settled, and defended on a distinct and separate consideration of the'individual case, but rather on broad and general grounds, which embrace the welfare of the whole community, and which seek the equal and impartial protection of the interests of all.” (Cooley's Constitution Lim., 4th ed., p. 443.)
The rule there announced is applicable to the present case, as the act of April 26, 1906, as amended, embraces the welfare of the whole tribe and seeks “ the equal and impartial protection of the interests of all ” in the common property until tribal relations cease. This is doing exact justice to *163 all, and anything short of this would be a violation of the trust reposed in the Government in dealing with its dependent wards.
By the act of June 28, 1898, supra, respecting the Choctaws and Chickasaws,’ it was provided that when their tribal governments cease they “ shall become possessed of all the rights and privileges of citizens of the United States,” from which we conclude that Congress did not intend to surrender their power of control over tribal property so long as tribal relations existed. Furthermore, when such tribal relations do cease, good faith requires that the Government shall not leave the Indian in the dark either as to his rights or the means by which such rights may be protected.
We deem it unnecessary to prolong the discussion, as under the authorities cited and the conclusions we have reached we must hold that the claimants acquired no vested rights in the allottable lands remaining after the allotments to them of the quantity specified in section 11 of the act of July 1,1902, as no further provision is made therein for allotment of the remaining unallotted lands; and certainly no interest became completed in the remaining unallotted lands before the act of April 26,1906, as amended, was passed; and therefore the claimants acquired no vested rights therein or rights the taking of which would be obnoxious to the fifth amendment of the Constitution. It follows that we must hold that the act of April 26, 1906, as amended, is a valid statute, though we may add that if we entertained doubt we should, nevertheless, incline to resolve all doubt in favor of the validity of the statutes, leaving the Supreme Court to finally determine the question.
For the reasons we have given the petition is dismissed and judgment ordered for the defendants.
Howry, J.,
upon the claimants’ motion for a new trial, delivered the following opinion:
Since the reargument of this cause and a closer examination of the questions the doubts which have occurred to me respecting the validity of the legislation referred to the court for determination will be stated with my conclusions, because I do not subscribe to everything the majority of the *164 court have said, either in their original or revised opinion. My statement will at least show no want of reflection on the merits of the case.
I am free to state these doubts in my own way, because of the character of the act, of our jurisdiction, and because of' the reasons which apparently led to its passage.
Ordinarily, every reasonable doubt respecting the constitutionality of statutes should be resolved by the courts in favor of the validity of such legislation. But the prompt action of Congress in acting upon the able report of one of their committees saying that the acts here complained of were not valid presents something different from the ordinary case coming before a court under the general rule stated.
Congress conferred upon the Cherokees subject to enrollment under the act of July 1, 1902, 32 Stat., 716, an undivided individual proportionate interest in the surplus lands and funds of the Cherokee Nation, so as to exclude all others from participation. The act was silent as to the method of disposition of those lands which should remain unallotted, but it exjiressly provided that if any person entitled to be enrolled should die subsequent to September 1, 1902, before receiving his allotment, the lands which would have been allotted .to said person, if living, should be allotted in his name and should, “ with his proportionate share of other tribal property,” descend to his heirs, according to the laws of Arkansas. By the terms of the act it was provided that the scheme for all distributions should be submitted for ratification to the Cherokee people. The scheme was so submitted, and subsequently ratified by the Cherokees and proclaimed by the United States and the authorities of the Cherokee Nation in effect as final. The number of persons entitled to enrollment for the jmrposes of allotment and distribution on July 1, 1902, being unknown, it resulted that after allotment to the duly enrolled members in accordance with the provision of the act of July 1, 1902, lands remain undisposed of sufficient to provide over 3,000 allotments, of the present aggregate value of about $3,000,000.
Subsequently, by an act approved April 26,1906, provision was made for the enrollment of Cherokees who were minors *165 living on March 4, 1906, whose parents had been enrolled as members of the Cherokee and certain other tribes. Notwithstanding the inclusion of the minors of Cherokee parents in the words of this latter act, it was provided that such applications for enrollment should not be received where the date of filing applications had been fixed by agreement between any tribe and the United States; and, the date for determination of filing applications having been fixed as of October 31, 1902, by the agreement between the United States and the Cherokees, it is claimed that the provision of the act of April 26, 1906, did not apply to the Cherokees. But by the act of June 21, 1906 (34 Stat., 325), this act was amended so as to repeal this provision and to make the said act of April 26, 1906, in this particular, apply to the Cherokees. The contention of the claimants is that the act of April 26, 1906, as amended June 21, 1906, deprives petitioners and all others on whose behalf this suit is brought of their vested property rights in and to the lands and funds and other undivided property of the Cherokee people in violation of the constitutional provision that no person shall be deprived of his property without due process of law.
Notwithstanding that it was provided by the act of July 1, 1902, that no child born after said date to a citizen of the Cherokee Nation should be entitled to any allotment or participation in the tribal property, and that the roll made under the act. as of September 1, 1902, when approved, should be final, the court has found that under. the later legislation 5,610 minor children of enrolled Cherokee parents, born after September 1, 1902, and living on March 4, 1906, have been enrolled on separate lists as Cherokee citizens the same as those enrolled under the act of July 1, 1902.
The eleventh and twelfth findings of the court show that the Cherokee national council authorized its principal chief to appoint a commission to represent the Cherokee Nation in the preparation of legislation for the final settlement of their affairs and the relations of the tribe with the United States; that a commission was appointed accompanied by a joint resolution of the national council of the Cherokee Nation to the effect that all children born since September 1, 1902, and prior to March 4, 1906, should be entitled to *166 share equally with children born prior thereto in the lands and moneys as provided by the act of July 1, 1902. The thirteenth finding shows that by a conference between this commission and representatives of the Interior Department and the House and Senate Committees on Indian Affairs legislation ensued providing for the enrollment of minor children living on March 4, 1906, as hereinbefore stated.
The validity of the legislation under consideration must be determined without reference to those acts of the Cherokee council which resulted in the appointment of its committee to secure from the United States the enrollment of the after-born children.
The findings which show the methods employed to obtain the action of Congress are immaterial, because under section 2 of the amendments to Article I of the constitution of the Cherokee Nation the character of the title to the lands of the nation had been changed. That section provided that the lands of the nation should remain common property — that is, common property of the nation for the benefit of the tribe— until the national council should request the survey and allotment of the same in accordance with the provisions of article 20 of the treaty of 19th of July, 1866, between the United States and the Cherokee Nation. The national council had already requested the survey and allotment of the lands in accordance with that treaty, and the request (having been submitted to the Cherokee people under a law of Congress to carry out treaties) had been ratified and the then existing controversy respecting the affairs of the tribe had been closed by a decision of this court, which was duly affirmed by the Supreme Court in the Cherokee Intermarriage Cases (203 U. S., 93). Section 25 of the act of July 1, 1902, which imposed a limitation as to who should be enrolled exhausted the power of the Cherokee national council to make any further request in the premises. So any subsequent action of the council seeking to reverse the popular vote has nothing to do with this case.
The Cherokee lands had been before this act of July 1, 1902, conveyed to the Cherokee Nation in fee simple. Holden v. Joy (17 Wall., 211.) With the adoption of the Cherokee constitution the title to the common property passed *167 from tbe communal owners and became vested in the nation as public lands and held by the nation in its political and corporate capacity for the whole tribe. (Whitmire’s Case, 30 C. Cls. R., 154; Eastern Cherckees v. United States, 40 C. Cls. R., 252; 202 U. S., 101.) (See companion case of Brown et al v. United States, 44 C. Cls. R.) So far then as the legislation had proceeded under the treaties by the act of July 1, 1902' (which professed to execute the treaties), the title to the unallotted lands and funds had passed out of the Cherokee Nation and had taken on the character, as to the persons authorized to be enrolled as of September 1, 1902, of an ownership in common for the benefit of all the members of the tribe living as of September 1, 1902.
Aside from the want of authority of the Cherokee council to pass any resolution which could bind the individuals declared by law to be entitled to the unallotted lands and funds, the resolution was ineffective for the want of approval by the President (30 Stat., 84; 31 ibid., 1077); nor can we assume that any request emanating from the Cherokee council led Congress to take from the enrolled Cherokees the property which the act of July 1, 1902, attempted to give to them, because the act of April 26, 1906, excluded the Cherokees from its operation. Though the amendment of June 21, 1906, did in terms make the obnoxious legislation applicable to the undistributed lands and funds of the Cherokee citizens, there is nothing to show any agreement between the Cherokee council and Congress which led to that amendment.
The ultimate question for determination is whether the lands and funds not allotted became the private, personal property of those citizens of the United States yet known as Cherokees living at the time fixed for final ■ enrollment and their heirs as tenants in common. That is, whether the unallotted lands and funds remained in the hands of the United States as trustee to distribute among the aforesaid cestuis que trust named as such by a law formally approved by the contracting parties, or became the subject of other ■and different disposition according to the will of Congress.
.The majority of the court reason that the act of April 26, 1906, as amended, is valid because that legislation “ embraces *168 the welfare of the whole tribe ” under a rule which seeks the equal and impartial protection of the interests of all in the common property until tribal relations shall cease. It does not, however, seem to me that such a rule (merely of welfare) can be invoked, because this is not a matter of expediency or of sentiment, but one of right claimed on the one side and denied on the other under an alleged contract made by and for persons living September 1, 1902. And if it be true, as stated at the argument (and not denied), that three-fifths of the after-born children were of white parentage, the wellfare of the whole tribe — certainly not of the full-bloods — is not established.
Incidentally the white parents of three-fifths of the new class might profit, while those to whom no children were born subsequent to the contract would receive no benefit.
Nor in the attempt to equalize 3,800 allotments among a new class numbering 5,610 it must not be overlooked that (if the matter of welfare is to be considered) it is only the rights and not the convenience and advantage of the after-born children which can be considered.
This court recently decided under a special act that conferred jurisdiction and under which 1,200 colored people sharfed in the distribution of certain Cherokee funds but were denied admission to the rolls under this allotment scheme (their rights probably being the same), that the court would retain a cause which those persons had instituted, to see that complete justice should be done to all such claimants whose names do not now appear on the rolls. (Whitmire, Trustee, v. United States, 44 C. Cls.)
All this, however, is beside the-real question.
The joint resolution of March 2, 1906, continued the existence of the governments of the civilized tribes under existing laws until all property should be distributed. The claimants contend that this surplus remained in the hands of the United States as trustee to distribute among those whom the United States had recognized by law as owners of the property in carrying out the treaties of the Government with the Cherokees.
Some state decisions are referred to in support of the contention. Thus, in Drew v. Carroll (28 N. E. (Mass.), 148), *169 a statute was considered by the supreme court of Massachusetts which made all Indians citizens of the State and gave the right to the Herring Pond Indians to have partition of their common land to be afterwards divided; and where a scheme of allotment through state officers was provided in the act it was held that immediately upon their being made citizens each Indian acquired an undivided right, title, and interest in the lands, which he could mortgage even before partition was had.
In Webster v. Reid (1 Morris (Iowa), 615), where certain half-breeds of the Sac and Fox tribes held fee simple title as tenants in common, it was held that the legislature had not the power to destroy vested rights, although it might create or augment them. This case was followed by that of Wright v. Marsh (2 Green (Iowa), 94), where it was held that no feature of an act could be considered as valid or effectual which would have a tendency to destroy, or even impair, vested rights.
If the act of July 1, 1902, was an agreement with the members of the Cherokee tribe, and such members were citizens of the United States, there is great force iñ the argument that each membér of the tribe living September 1,1902, acquired an undivided interest in the common lands, free from any right of change, because the future distribution of that property was designed to be ministerial in character; and the exercise of further plenary power on the part of the Government was not intended except for the benefit of those embraced in the ratified agreement.
The further contention that when citizenship was conferred there was no tribe is likewise of much force. The Cherokee government remained, but the tribal right of control of the land had gone out of that government for the benefit of individuals. Indian courts had been abolished, and the members of the tribe had practically assimilated such rights as all other citizens enjoyed.
The majority of the court is of opinion that “ the rights of said allottees under the act of July 1, 1902, in and to the unallotted lands after September-1, 1902, remained the same as they were before that date.” Petitioners and persons associated with them were the exclusive owners at the time *170 mentioned, with the right ultimately under treaties to have an equal share of the common property whenever the time might be agreed upon. This right did not depend wholly upon the act of July 1, 1902, but was primarily dependent (the United States consenting) upon a law of the Cherokees as well fixed and settled as the laws of descent and distribution elsewhere. It is a contradiction to say that under the new legislation the rights of the allottees fixed by the act of July 1, 1902, remained the same in and to the unallotted lands if a new class numbering 5,610 people be admitted, because the new class must necessarily absorb every piece of unallotted land, and to make this new class equal nearly all the available funds must likewise be absorbed for the benefit of the new class. Thus, the rights of the former allottees are in effect superseded and are therefore no rights at all if the Congress have the power to take land and moneys from the old class to give to the new.
Prior to September 1, 1902, the Cherokees were entitled to claim as communal owners, but after that date they were equitable owners free from Cherokee national control. And the Cherokee agreement said that no child born after September 1, 1902, should be born into the right, and that no person dying after that date should, die out of the right. By the act of July 1,1902, Congress recognized the prerogative of the Cherokees to change the character of their title from communal to common. The Cherokees adopted the change, and we have seen, according to the decision of the Supreme Court, that both parties to the agreement gave their formal consent.
From the foregoing it will be seen that there is great reason to doubt the validity of the legislation which forms the subj ect-matter of the petitioners’ complaint. Generally speaking, any estate, property, or interest is called “ vested,” whether in possession or not, which is not subject to any condition precedent and unperformed. The interest may be either a present and immediate interest, or it may be a future but uncontingent, and therefore transmissible, interest. A vested estate in possession is a term applying to a right of present enjoyment actually, existing.
In constitutional law vested rights are those which have so completely or definitely accrued to or settled in a person *171 that they are not subject to be defeated or canceled by the act of any other private person, and which it is right and equitable that the Government should recognize and protect as being lawful in themselves, and settled according to the then current rules of law, and of which the individual can not be deprived arbitrarily without injustice, or of which he could not justly be deprived otherwise than by the established methods of procedure and for the public welfare. Black’s L. Die., 1218.
Notwithstanding that the act of July 1, 1902, was a promise in redemption of treaty agreements, the legal title to the unallotted lands — accompanied by possession — is not yet in a single individual living as of September 1, 1902. In Stephens v. Cherokee Nation (174 U. S., 445) (which was predicated upon the ruling in Choctaw Nation v United States, 119 U. S., 27), the determination of membership in a tribe was reserved by the Government for the purpose of adjusting all rights in the tribal property. That case in effect and generally holds as to unallotted lands and undistributed moneys that such lands and moneys remained public lands and public moneys until held in individual ownership. The court there said that “ The assertion by any particular applicant that his right therein is so vested as to preclude inquiry into his status involves a contradiction in terms.” But that expression related to those who were claiming as entitled but whose right as a member was the subject of investigation by lawful authority. The scope of the decision was, however, that Congress could legislate if the subject of the legislation related to tribal property. The act under consideration in that case was spoken of as correlative legislation which related to the determination of membership in the tribes for the purpose of adjusting rights in the tribal property. The court declined to intimate any opinion as to the effect of changes made by the subsequent legislation or by the agreements mentioned as having been made, respecting the “ status ” of the petitioners. In Cherokee Nation v. Hitchcock (187 U. S., 307), title remained in the tribe and did not vest in the individuals although held by the tribe for the common use and equal benefit of all the members; and in that respect the correlative legislation like that in the *172 Stephens case, ante, related to the determination of membership in the tribe for the purpose of adjusting the property right. In the Hitchcock case the court adverted to the case of Cherokee Trust Funds (117 U. S., 288), where it was said that whatever title the Indians had was in the tribe and not in the individuals, although held by the tribe for the common use and equal benefit of all the members. The Hitchcock case rested further administrative control upon the statement that the lands and moneys involved were public lands and public moneys where treaties had not evinced any intention upon the part of the Government to discharge the beneficiaries from their condition of pupilage or dependency.
Following these decisions came the case of Lone Wolf v. Hitchcock (187 U. S., 553), which dealt with an act passed at a time when the tribal relations between certain confederated tribes still existed and where the original statutes and the statutes supplementary thereto dealt with the disposition of property undoubtedly tribal, in which the court said that administrative control continued at least so far as tribal lands were concerned.
It was competent for Congress to provide by additional legislation for the verification of the rolls directed to be prepared so that only those persons possessing the necessary qualifications should receive anything.
Whether it was competent to admit another and different class by later'legislation depends upon the character of the title and the relation of the property to the members of the tribe. In a sense the unallotted lands were not tribal lands after September 1, 1902, because the tribal interest theretofore held by the. nation had passed to a class with a common individual right with such an interest in the land as that death could and did terminate as to the person dying, but transmissible to an heir and yet made the subject of partition by the agencies of the government for the benefit of those living and the heirs of those dying. The right being transmissible to heirs, and inheritable by those entitled to share by virtue of parentage, it would seem that the continued existence of the Cherokee government was solely for the purpose of enabling the United States, in cooperation with the Indian government, to carry, out the scheme. If the exist *173 ence of the Cherokee government June 21, 1906, gave 5,610 infants living on March 4, 1906, the right to participate and yet excluded those born since the last-mentioned date np to the period of final allotment, we find an unequal distribution at last because of the continuation of the Cherokee government to a later date. Consequently, those born since the 4th of March, 1906, may even now be admitted to share if the act of 1906 is a valid statute.
The contention that the act of July 1, 1902, took from the unallotted lands the character of tribal lands is not without force, because that act evinced a clear intention to carry out treaty agreements by definitively providing for certain individuals to be enrolled as tenants in common. In Delaware Indians v. Cherokee Nation (193 U. S., 127) Mr. Justice Day declared, on the authority of the Cherokee Trust Funds case (17 U. S., 308), that the lands of the Cherokees then belonged to the nation as a political body and not to the individual members of the tribe. But in speaking of the rights of individual Cherokees as matters then stood, it was said that each Cherokee “ had a right to use parcels of the lands thus held by the nation, subject to such rules as its governing authority might prescribe.” In Eastern Cherokees v. Cherokee Nation et al. (202 U. S., 101) Mr. Chief Justice Fuller also dealt with the matter of Cherokee title in its then condition and stated that the Cherokee government was trustee for all of its people. In the Cherokee Intermarriage cases (203 U. S., 76), from which decisions this litigation sprang (inasmuch as large numbers of the intermarried whites were declared not entitled to participate, thereby leaving an excess of unallotted land), it was said that the amendments of 1866, article 1, section 2, of the treaty declared that the lands of the Cherokee Nation should remain common property, title, being in the nation, until the national council should request the survey and allotment of the same pursuant to the treaty of July 19, 1866. As the request of the national council was duly made, it can not be denied that the new legislation was framed in disregard of the amendment to that treaty. In fact, the terms of those agreements were broken by the legislation’ which admitted a class not sanctioned by the whole body of people in actual interest.
*174 Without speculating further upon the nature of the Cherokee title (a full exposition of which may be found in Whitmire’s case, 30 C. Cls. R., 148, and Cherokee Nation v. Journeycake, 155 U. S., 196), and the changes made by the agreement resulting from the action of the Cherokee government and the United States, it is apparent that though the subsequent legislation admits a new class the unallotted lands are in a sense yet tribal. They belong to Cherokees, but have not been reduced to possession. There is yet no right in severalty free from some administrative control by the United States, true though it is the unallotted lands do not seem to be subject to the further operation of the Cherokee constitution, because the title passed out of the nation so far as the ratified agreement could have that effect.
The new class provided by the later and amended legislation can participate only upon the theory that notwithstanding the tribe had elected for a specific division among those living September 1, 1902, it was competent to admit the newly born people because those provided for by the act of July 1, 1902, had not come into the possession as individuals of the property proposed to be given to them in final form. The body of unallotted lands was and is yet a public-trust estate for the benefit of Cherokee Indians even though such Indians have been invested with the status of citizenship. The lands and moneys in controversy being yet public lands and public moneys and no certificate or patent having issued to fix the private right in severalty, it is probably safest to say that the political power of the Government to deal with the unallotted lands and make final disposition of all the undistributed property has been properly exercised.
Whilst not unmindful of the suggestion that the individual members of the tribe enrolled as of September, 1902, and their heirs became as much entitled to the surplus lands and undistributed funds as to the lands allotted and confirmed by patents and possession, this court must conform as near as may be to what the supreme authority has indicated with respect to administrative control where Indian lands are yet undivided and tribal. True, none of the cases cited present the exact question presented here because the nature of the *175 compact disclosed by this record makes the circumstances different.
But the Indian interest in the unallotted property was not an enforcible interest in the courts, and until Congress completed the scheme by making the final distributions in the Government’s own way the equitable owners were remediless. When the political authority saw fit to change the supposed fundamental agreement by incorporating new beneficiaries before the actual dissolution of the tribe, the courts apparently were not at liberty to interfere.
As to the allotted lands, title vested in fee simple as to every tract surrendered. The guardianship of the Government over the Indian’s exclusive control and possession of land conferred by patent no longer existed. The United States could exercise no control because the trust relationship had ceased to exist. Every individual holding by patent obtained a vested right in fee from the Cherokee Nation by and with the consent and cooperation of the United States, which, in the words of the Supreme Court, “ can not be divested by any subsequent act of Congress or by the executive departments.” 175 U. S., 19-21.
In the doubt growing out of the interpretation to be given to what the court of last resort has said with respect to that which is or may not be tribal property, I am unwilling now to say that the legislation which provides for the after-born children to participate in the surplus property is unconstitutional, and therefore invalid. Accordingly, I concur in the result that the petition be dismissed.